# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| DARREN MEADE,<br><br>              Plaintiff,<br><br>vs.<br><br>BEN SMITH, in his individual capacity and his official capacity as Sac County Attorney,<br><br>              Defendant. | No. C17-4034-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

_____

This case is before me on defendant Ben Smith's motion (Doc. No. 34) for summary judgment. Plaintiff Darren Meade filed a resistance (Doc. No. 40) and Smith filed a reply (Doc. No. 43). Oral argument is not necessary. *See* Local Rule 7(c).

## I.    PROCEDURAL HISTORY

Meade commenced this action on May 11, 2017, by filing a complaint and jury demand (Doc. No. 1). In general terms, Meade alleges that Smith violated his constitutional rights by misusing his powers as a prosecutor to punish him for speech that is critical of Smith. Specifically, Meade asserts the following claims:

Count I –      Violations of the First, Fourth, Fourteenth and Sixth
               Amendments pursuant to 42 U.S.C. § 1983

Count II –     Abuse of Process pursuant to 42 U.S.C. § 1983

Count III –    Malicious Prosecution under Iowa Law

Count IV –     Invasion of Privacy pursuant to 42 U.S.C. § 1983

Doc. No. 1 at 29–31. Meade seeks declaratory and injunctive relief, compensatory damages, punitive damages, interest, attorney fees and costs. *Id.* at 32–33.

During discovery, Smith filed a motion (Doc. No. 20) to compel, or in the alternative, to exclude evidence, due to Meade's invocation of the Fifth Amendment in response to deposition questions and interrogatories about his past income and taxes. Smith argued that if Meade continued to refuse to respond to questions about his past income, Meade should be precluded from offering any evidence at trial regarding economic damages. Doc. No. 20 at 3. United States Magistrate Judge Mark A. Roberts denied Smith's motion without prejudice on procedural grounds and due to inadequate briefing. Doc. No. 26.

Smith then filed a second motion (Doc. No. 29) regarding Meade's refusal to respond. Meade's attorney allegedly informed Smith that Meade would no longer invoke the Fifth Amendment in response to questions about his past income and taxes, but Meade still had not answered his interrogatories nor allowed his deposition to continue. Doc. No. 29 at 2–3. Judge Roberts granted (Doc. No. 31) Smith's second motion to compel and ordered that Meade appear for his deposition by April 1, 2019, or face the possibility of sanctions. Smith asserts that Meade did not comply with this order. Doc. No. 34-2 at 14, 33. Smith also asserts that Meade informed him that he would not pursue his claims for economic damages further but has not officially dismissed them. *Id.* at 14. Smith asks that the court sanction Meade by granting summary judgment in his favor on Meade's claims for economic damages. *Id.* at 33.

Smith filed his motion (Doc. No. 34) for summary judgment on May 1, 2019. Mead filed a resistance (Doc. No. 40) and Smith replied (Doc. No. 43). Meade's initial attorney withdrew from this case, Doc. No. 46, and Meade's replacement counsel filed a motion (Doc. No. 45) for leave to file a new and corrected brief in resistance to Smith's motion for summary judgment. I denied (Doc. No. 47) that motion. Trial is scheduled to begin April 27, 2020.

## II.  SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material." *Id.*  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49.  The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323).  Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## III. RELATED CASES

This case relates to the prosecution and conviction of Tracey Richter (Richter) for first-degree murder. Meade's interactions with Smith began after Meade took an interest in Richter's case. Meade believed Richter was innocent and reached out to Smith, Richter's prosecutor. The subsequent actions by Smith and Meade have been the subject of other lawsuits against Smith. Thus, familiarity with Richter's criminal case, and other subsequent litigation regarding Meade's and Smith's actions, is helpful in understanding the individuals and facts that are relevant to this motion.

The Iowa Court of Appeals described the facts of Richter's criminal case as follows:

> On December 13, 2001, Richter shot and killed Dustin Wehde in her home in Early, Iowa. A trial information was filed against her in Sac County

almost ten years later on August 5, 2011, charging her with murder in the first degree. Richter pleaded not guilty and filed a notice of an affirmative defense of justification. Trial was moved to Webster County.

There was no question Richter shot and killed Wehde. Richter used two different guns, and the autopsy showed Wehde had been shot nine times. Three shots were to the back of his head and neck; the trajectory of some of those wounds indicated the shots came from above Wehde. At least one shot occurred after blood had started to congeal. The crucial question at trial was whether Richter was justified in shooting Wehde.

The jury heard two very different stories. Each party has laboriously set out in their briefs the evidence supporting their version of events. The State emphasizes evidence showing Richter intentionally, deliberately, and premeditatedly killed Dustin Wehde to frame her ex-husband. For example, the State's crime scene reconstructionist, Rodney Englert, testified that the trajectories of the bullets and the wounds to Wehde indicated the initial shots could have been fired from an area in the southeast corner of the master bedroom near the gun safe and that the shots could have been fired as Tracey was crouched or kneeling. Englert stated later shots to Wehde's head would have been fired from above Wehde and that there was congealed blood on Wehde's face indicating a shot was fired into his head after he was dead.

Mary Higgins had been a good friend of Richter's in Early. She told the jury that shortly after the shooting, Richter and her family went on a several-week trip to Australia. When Richter returned in February, Richter told Higgins about the shooting "[l]ike she was telling me her grocery list. She basically had no emotion to it." Richter told Higgins that she "unloaded" the gun as she was being pulled at by the two intruders; she then got up and stepped over what she thought was dirty clothes to check on her children. Richter told Higgins,

> She took the two—well, the three children down the hall. And as they were going down the hall, there was a body there and she told me that the body was moving and she stood over him and said, "Stop moving" or either it was, "I'll blow your fucking brains out" or "I'll blow your head off."

> And she told me he continued to move and she stood over him and she fired the gun until he quit moving. Then they proceeded down the stairs.

Higgins further testified that Richter's son, Bert, came into the room while Richter was relaying the story and became "extremely agitated," began banging his head against the table, and stated "Why did you go up there? Why did you go back up there? You didn't have to shoot him. You didn't have to kill him."

Higgins further testified that Richter told her that the police found an older model computer and a pink notebook in the car left in her driveway the night of the purported home invasion. Richter described to Higgins details of the contents of that pink notebook, which included contact information for her first husband, Dr. John Pitman, with whom Richter was involved in a custody dispute. Richter told Higgins the notebook would prove her ex-husband was involved.

There was evidence that the contents of the notebook had been kept from the public by law enforcement, and Richter should not have known what was written in it. Higgins recounted an incident in 2004 when Richter pointed at Higgins face and told her "to forget about the pink notebook." The State argued that the contents of the notebook, referring to Richter's ex-husband and his detailed plans to have Richter and Bert killed, came from Richter herself in an attempt to win the custody dispute over Bert.

As for the defense, Richter points out testimony supporting her claim that she acted in self-defense during a home invasion. Richter claimed she acted in self-defense, giving several statements to police that two (or three) men broke into her home and accosted her, choking her with a pair of panty hose until she was unconscious. She was able to get to a gun safe in the master bedroom and, shooting blindly over her shoulder, shot one of the intruders and the other (or others) ran away.

Richter's son, Bert, who was eleven years old at the time of the shooting, testified that while watching TV in his room, he heard Richter yelling for help from down the hall. After Richter was pulled away from the door to Bert's room, Bert heard banging around in the hallway. Bert reported hearing Richter making a "very awful choking sound" for a few minutes. Then Wehde—whom Bert knew from previous interactions—came to the bedroom door and threatened Bert. Later, Bert heard footsteps running

away from his room followed by yelling and several loud bangs. Richter then opened the door to Bert's room. Bert said her wrists were bound with pantyhose. Bert then followed his mother, who had a gun in each hand. Bert said Wehde, who was lying on the floor, started to move. Bert said he then heard his mother warn Wehde not to move followed by a couple shots. On cross-examination, Bert agreed that his interview with police on the night of the shooting was his most accurate recall of the incident.

In the police interview, which occurred within hours of the shooting, Bert said nothing about Richter being pulled away from his room, about hearing banging and kicking noises in the hallway, or about hearing choking noises. Nor did Bert say in the interview that he saw Wehde moving or trying to get up, and he did not say he heard Richter telling Wehde to stay down.

The jury convicted Richter of first-degree murder, and she was sentenced to prison for life.

*State v. Richter*, 828 N.W.2d 326 (Table), 2013 WL 118357, at *1-3, (Iowa Ct. App. 2013) (footnote omitted).

After Richter's conviction, Meade began posting about her case, including his frustrations with Smith, on a website called RipOffReport.com (Ripoff Report). These posts by Meade, and others, led to a series of allegedly-retaliatory actions by Smith against Meade, Ripoff Report and its founder, Ed Magedson, and Richter's Mother, Anna Richter.

The corporate owner of the Ripoff Report, Xcentric Ventures, L.L.C. (Xcentric), and Magedson were the first to sue Smith for his alleged retaliatory actions. *See Xcentric Ventures, L.L.C. v. Smith*, C15-4008-LTS (N.D. Iowa). The parties to the *Xcentric* case ultimately entered into a stipulation of dismissal on June 16, 2017. *Id.*, Doc. No. 155.

Anna Richter also sued Smith. *See Richter v. Smith*, C16-4098-LTS (N.D. Iowa). The parties to the *Richter* case ultimately entered into a stipulation of dismissal on April 18, 2019. *Id.*, Doc. No. 35.

## IV.   RELEVANT FACTS

The parties complain about the adequacy of each other's statements of material facts. In resisting the motion for summary judgment, Meade argues that Smith failed to adequately cite support for his material facts in the record and, thus, his statement of material facts should be stricken.[1] Doc. No. 40 at 1. Due to this, Meade's response to most of Smith's material facts contains (1) an objection regarding Smith's citation to the record, (2) a simple denial and (3) a reference to facts listed in his own additional statement of material facts. Doc. No. 40-2. Meade includes citations to the record in his additional statement of material facts but not within his response to Smith's statement of material facts. Doc. Nos. 40-2, 40-3.

In response, Smith asserts that all of his citations to the record are appropriate and accurate. Doc. No. 43 at 1–4. He argues that Meade effectively conceded to his material facts because Meade did not include citations to the record in responding to those facts. *Id.* at 4. He also argues that the additional facts presented by Meade are immaterial to the summary judgment analysis, do not raise a genuine issue of fact and should be disregarded. *Id.* at 4–5.

After reviewing the statements of facts and the record, I conclude that the parties would have better spent their time focusing on the merits of the case rather than nitpicking each other's filings. Those filings are hardly perfect, and generated more work for the court than should have been necessary, but they are not so utterly deficient as to make it impossible to discern the relevant facts. The following facts have been compiled from my own review of the record, each party's factual statements and factual findings in prior related litigation (to which both parties have cited to support various factual assertions). Factual assertions that are irrelevant or not adequately cited have been disregarded. Any

---

[1] I found no glaring issues with Smith's citations to the record other than the fact that the page numbering of his appendix is three pages off from that of the docket numbering system. Smith cites to his own page numbering, not that of the court's ECF system. Meade appears to have looked only to the ECF page numbers. Decoding this discrepancy did not require advanced math.

relevant factual assertion bearing adequate citations to the record, and that was not properly refuted, has been deemed admitted. With these standards in mind, I find the following facts to be potentially relevant and, unless otherwise noted, to be undisputed.

Meade asserts that he attempted to contact law enforcement officials and Smith multiple times between February and April 2011 to provide information related to Richter's case. Doc. No. 40-3 at 1. He did not speak with anyone during these calls, but left messages for Smith in April 2011. *Id.* at 1, 3. The next evidence of contact between Meade and Smith is an email in April 2012, five months after Richter's conviction. Doc. No. 34-1 at 1. Meade stated a belief that Richter had been wrongfully convicted and provided evidence to Smith. *Id.* Smith contends he investigated Meade's claims and believed them to be false. *Id.* at 2. However, he reviewed few, if any, of the records and materials provided by Meade. Doc. No. 40-3 at 3.

Smith began to suspect that Meade was in communication with, and working for, Richter's family. Doc. No. 34-1 at 2. To investigate his suspicions, Smith used his power as a county prosecutor to subpoena Meade's phone records. *Id.* Meade's phone records revealed that Meade had been in regular contact with Richter's family since Richter's conviction in November 2011. *Id.*

Beginning in September 2012, Meade posted comments about Richter's trial and conviction on Ripoff Report. *Id.* Meade's original post, which described Meade's investigation into and beliefs about Richter's case, contained complaints and allegations against Smith and other comments about several witnesses from Richter's trial, including Ray and Marie Friedman, John Pitman, Mary Higgins and Michael Roberts (designated as witness but did not testify). *Id.* Meade stated that he believed Mary Higgins and the Friedmans lied during the trial. Doc. No. 34-3 at 54, 56–57, 63.

Many of Meade's posts, including his original post regarding Richter's case, center on Michael Roberts, Richter's ex-husband, and make various accusations of criminal conduct against him. *Id.* Meade had a contentious history with Michael Roberts, which included failed business relationships. He created at least one post about Roberts

on Ripoff Report before any posts related to the Richter case. Doc. No. 34-3 at 30–47. Meade has alleged that Roberts told him he had hired two men to kill Richter. Doc. No. 40-3 at 3. He also alleges that Roberts threatened to kill him. *Id.*

Smith, too, has been the subject of various reports, replies, updates and rebuttals on Ripoff Report. Doc. No. 34-3 at 183–84. He testified that his own photo appears on approximately two million pages on the Ripoff Report website and many statements have been published about him and his family. *Id.* Among other things, Smith alleges that he has been accused on Ripoff Report of having sexual relationships with witnesses and abusing methamphetamine. *Id.*

At some point in 2013, John Pitman and Ray Friedman contacted Smith with concerns regarding content about them on Ripoff Report. *Id.* at 3. Pitman had discovered posts on Ripoff Report about himself, his business and, allegedly, his testimony in Richter's trial. *Id.* The posts were harmful to Pitman and his medical practice, and he sought help from Smith because he suspected the posts were some form of retaliation for his testimony in Richter's trial. *Id.* However, Pitman did not believe, nor tell Smith, that Meade was behind the posts. Doc. No. 40-3 at 4. Indeed, the Ripoff Report post about Pitman in the record appears to be authored by someone other than Meade, but Smith alleges that Meade often used pseudonyms for his posts and was the true author. *Id.* at 5; Doc. No. 34-1 at 7. The only item related to Pitman's business that Meade has admitted to posting involved allegations against Pitman by the Virginia Board of Medicine, but that post was not on Ripoff Report. Doc. No. 40-3 at 5; Doc. No. 40-4 at 93; Doc. No. 34-1 at 8. Pitman never contacted Ripoff Report to dispute the allegations or ask that they be removed. Doc. No. 40-3 at 5.

It is undisputed that Meade posted other complaints about certain witnesses on Ripoff Report, such as complaint number 1009000 in February 2013, which contained the following title:

Mile2 Michael Roberts Rexxfield Raymond Friedman Writes Mile2 Michael Roberts Rexxfield Raymond Friedman Marie Friedman Graphic

Depictions Of Child Molestation, Child Torture, Exact Recipes Of Liquid Explosives, Type Bombs Illicit Recordings, Internet.

Doc. No. 34-1 at 4–5, 7. Thus, the names of two witnesses who testified against Richter are listed immediately before the phrase "Graphic Depictions Of Child Molestation, Child Torture, Exact Recipes Of Liquid Explosives, Type Bombs Illicit Recordings." *Id.* Due to complaint titles such as these, and search engine optimization, Ripoff Report pages would appear at or near the top of internet search engine results for the state's witnesses and their businesses. *Id.* at 4. However, Meade has alleged that he "did not necessarily author the 'headlines' or 'title' associated with [his] postings" on Ripoff Report. Doc. No. 40-3 at 5.

Allegedly in response to Pitman's and Friedman's concerns, and due to his suspicion that Meade was working with Richter in creating the Ripoff Report complaints, Smith contacted the Iowa Department of Corrections to obtain recordings of Richter's calls. Doc. No. 34-1 at 10. In listening to these recordings, Smith alleges he discovered that Richter's conversions often correlated to Ripoff Report postings and updates. *Id.* That is, information about a witness, such as Pitman, would be discussed by telephone and would soon thereafter appear on Ripoff Report. *Id.* Smith ultimately monitored more of Richter's conversations and issued over 100 county attorney investigatory subpoenas to obtain records and documents concerning the possible connection between Meade, Ripoff Report and its owner, and the Richter family. *Xcentric Ventures*, No. C15-4008, Doc. No. 55 at 15–16. Special agents for the Iowa Division of Criminal Investigations also investigated whether Richter and her family were attempting to influence or coerce witnesses who had testified against her. Doc. No 34-1 at 10–11. Those special agents believed that Richter and her family contributed to the posts about witnesses on Ripoff Report. *Id.*

On July 7, 2014, Smith applied for a search warrant authorizing a search of Anna Richter's home in Urbandale, Iowa, and the seizure of computers, smart phones, digital storage devices and similar items. Doc. No. 34-1 at 12–13; *Xcentric Ventures*, No. C15-

4008, Doc. No. 55 at 15–16. The application was supported by Smith's 119-page, single-spaced affidavit, which contained several pages alleging Meade's involvement in unrelated criminal activity and prior business dealings with Michael Roberts. *Xcentric Ventures*, No. C15-4008, Doc. No. 55 at 16; *Richter*, C16-4098, Doc. No. 33 at 9. Smith admits that some of the information contained in the affidavit came from Roberts and others who had an adverse history with Meade and/or Ripoff Report and had been investigating Meade and Ripoff Report on their own accord. *Xcentric Ventures*, No. C15-4008, Doc. No. 55 at 16; Doc. No. 40-4 at 154–59. Smith provided drafts of the affidavit for many of these individuals to review, with at least one individual then posting the affidavit on the internet. Doc. No. 40-4 at 13–17.

The search warrant was issued the same day. *Xcentric Ventures*, No. C15-4008, Doc. No. 55 at 16. Smith then filed the application, affidavit and warrant with the Iowa District Court for Sac County on July 9, 2014. *Id.* Smith testified that he made a deliberate decision not to file the application under seal even though it is his usual practice to do so. *Id.*; Doc. No. 40-4 at 16–18.

Smith eventually brought criminal proceedings against Meade in the Iowa District Court for Sac County. Doc. No. 34-1 at 13. A trial information filed September 2, 2014, alleged one count of ongoing criminal conduct, eight counts of witness tampering and one count of obstructing prosecution. *Id.*; Doc. No. 34-3 at 11–22. On May 27, 2015, Smith filed a motion to dismiss the criminal charges against Meade with prejudice. Doc. No. 34-1 at 13. The Iowa District Court granted the motion the same day, thus ending the case. *Id.*

## V. DISCUSSION

Meade asserts four causes of action against Smith: (I) a § 1983 claim for violations of the First, Fourth, Sixth and Fourteenth Amendments, (II) a § 1983 claim for abuse of process, (III) a malicious prosecution claim under Iowa law and (IV) a § 1983 claim for invasion of privacy. Smith argues that many of the claims Meade asserts fall within the

scope of absolute prosecutorial immunity. He further argues that even if some claims fall outside absolute immunity, he is still entitled to judgment as a matter of law on those claims.

Smith argues that he is entitled to summary judgment on Meade's First and Fourth Amendment claims in Count I, and the malicious prosecution claim in Count III, because Meade has failed to show that Smith lacked probable cause. Doc. No. 34-2 at 22–30. He does not contest any other elements of these claims. Smith also argues that Meade's Sixth Amendment claim in Count I fails because the alleged violations occurred before any charges were filed against Meade. *Id.* at 20–21. Finally, Smith argues that he is entitled to summary judgment on Counts II and IV because § 1983 does not permit the type of abuse of process or invasion of privacy claims that Meade asserts. *Id.* at 19–20, 30–31.

Meade resists Smith's motion for summary judgment only as to the First Amendment retaliation claim in Count I and the malicious prosecution claim in Count III. Meade acknowledges that some of Smith's actions may be protected by absolute immunity but not all. Doc. No. 40-1 at 9–12. Specifically, Meade alleges that (1) Smith spent hundreds of hours investigating Meade and Xcentric, owner of Ripoff Report, with the aid of private individuals who are known to be enemies of Meade and Ripoff Report, (2) Smith worked and exchanged confidential information with private individuals to draft a search warrant affidavit that contained unrelated allegations of criminal conduct and impropriety in business dealings against Meade and that was published publicly, and (3) Smith filed a motion to quash a subpoena in Richter's and Michael Roberts child custody case in another county with the intent to create an official record of criminal allegations against Meade in order to shame and defame him. *Id.*

For some reason, Meade does not specifically address Smith's probable cause arguments. Instead, he bases his argument solely in the belief that Smith's failure to show that his actions are entitled to absolute immunity precludes summary judgment in his favor. *Id.* He also cites to this court's prior findings in related cases as support for

denying summary judgment. *Id*. at 11. Because a finding of absolute immunity would impact any further analysis of Meade's claims, I begin with that issue. I note, however, that absolute immunity does not apply to requests for declaratory and injunctive relief. As such, a finding of absolute immunity would require the entry of summary judgment on the issue of money damages, but not on other forms of relief.

## A. *Absolute Prosecutorial Immunity*

Prosecutors are absolutely immune from damage liability in a suit for conduct "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976). Whether prosecutorial conduct is "intimately associated with the judicial phase of the criminal process" requires "a focus[] on the conduct for which immunity is claimed, not the harm that the conduct may have caused or the question whether it was lawful." *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993). In *Buckley*, the Supreme Court divided the functions of the prosecutor as follows:

> [In *Imbler*,] [w]e expressly stated that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and are nonetheless entitled to absolute immunity. We noted in particular that an out-of-court "effort to control the presentation of [a] witness' testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate." To be sure, *Burns* made explicit the point we had reserved in *Imbler*: A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.
>
> On the other hand, as the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are

performed by a prosecutor. Qualified immunity "represents the norm" for executive officers, so when a prosecutor "functions as an administrator rather than as an officer of the court" he is entitled only to qualified immunity. There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he "has no greater claim to complete immunity than activities of police officers allegedly acting under his direction."

*Buckley*, 509 U.S. at 272–74 (citations omitted).

Importantly, the "function" is evaluated from the time it is performed. "A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." *Id.* at 276; *see also Burns v. Reed*, 500 U.S. 478, 495 (1991) ("Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive."). Also, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486.

Meade asserts that Smith's investigation into him and Xcentric is not protected by absolute immunity. I agree. Although Smith's ultimate decision to charge Meade with witness tampering falls squarely within the core functions of a prosecutor, his investigation prior to that point does not. *Burns*, 500 U.S. at 493 (prosecutors are not entitled to immunity for administrative or investigative functions normally performed by a police officer); *see also Buckley*, 509 U.S. at 273 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone

arrested."). Moreover, Smith has failed to explain how his investigation into Meade was "intimately associated with the *judicial phase* of the criminal process," *Imbler*, 424 U.S. at 430–31 (emphasis added), or "advocacy on behalf of the government." *Schenk v. Chavis*, 461 F.3d 1043, 1046 (8th Cir. 2006).

Smith's other challenged actions are not protected by absolute immunity for similar reasons. Smith has not provided any support for the proposition that filing a motion to quash a subpoena in a civil case unrelated to Meade, which contained many allegations of criminal conduct against Meade, was in any way advocacy for the government. *See Venckus v. City of Iowa City*, 930 N.W.2d 792, 805 (Iowa 2019) (prosecutors were not entitled to absolute immunity for ethics complaint filed against plaintiff's attorney in an unrelated case). Likewise, Smith's decisions (1) to allow private parties to influence a search warrant affidavit, (2) to provide and exchange information about subjects in the affidavit to those private parties and (3) to file the search warrant materials publicly rather than under seal, all indicate actions that are meant to further private interests rather than governmental ones. Smith has not shown that he was acting in the role of an advocate evaluating and preparing evidence for an indictment and trial rather than as a detective "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested." *Buckley*, 509 U.S. at 273–74. Additionally, Smith has not presented any argument as to how these choices were associated with the judicial phase of the criminal process. Thus, Smith is not entitled to absolute immunity for these actions.

Typically, if a prosecutor is not entitled to absolute immunity, then a qualified immunity analysis applies. Here, however, Smith has not made any argument for qualified immunity other than the existence of probable cause, which has been regarded as grounds for qualified immunity in some cases. *See Greenman v. Jessen*, 787 F.3d 882, 891 (8th Cir. 2015) (officers and prosecutor were entitled to qualified immunity on First-Amendment retaliatory arrest claim because there was probable cause for the arrests). Thus, I will not consider any other grounds for qualified immunity.

## B.    *First Amendment Retaliation*

"'Criticism of public officials lies at the very core of speech protected by the First Amendment.' Retaliation by a government actor in response to such an exercise of First Amendment rights forms a basis for § 1983 liability." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002) (citation omitted). To establish such a claim, a plaintiff must prove (1) he or she engaged in a protected activity, (2) the defendant responded with adverse action that would "chill a person of ordinary firmness" from continuing in the activity, and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity." *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799 (8th Cir. 2012).

Smith argues that he is entitled to summary judgment on Meade's First-Amendment retaliation claim because Meade has failed to show a lack of probable cause for Smith's actions. The absence of probable cause has been recognized as a fourth element for First-Amendment retaliation claims in some cases. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("[A] plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."); *Hartman v. Moore*, 547 U.S. 250, 263–66 (2006) (absence of probable cause is necessary for retaliatory prosecution claim). The Supreme Court explained its reasoning in *Nieves*:

> For a number of [First-Amendment] retaliation claims, establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward. Indeed, some of our cases in the public employment context "have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other," shifting the burden to the defendant to show he would have taken the challenged action even without the impermissible motive. But the consideration of causation is not so straightforward in other types of retaliation cases.

> In *Hartman*, for example, we addressed retaliatory prosecution cases, where "proving the link between the defendant's retaliatory animus and the plaintiff's injury . . . 'is usually more complex than it is in other retaliation cases.'" Unlike most retaliation cases, in retaliatory prosecution cases the official with the malicious motive does not carry out the retaliatory

action himself—the decision to bring charges is instead made by a prosecutor, who is generally immune from suit and whose decisions receive a presumption of regularity. Thus, even when an officer's animus is clear, it does not necessarily show that the officer "induced the action of a prosecutor who would not have pressed charges otherwise."

To account for this "problem of causation" in retaliatory prosecution claims, *Hartman* adopted the requirement that plaintiffs plead and prove the absence of probable cause for the underlying criminal charge. As *Hartman* explained, that showing provides a "distinct body of highly valuable circumstantial evidence" that is "apt to prove or disprove" whether retaliatory animus actually caused the injury: "Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive." Requiring plaintiffs to plead and prove the absence of probable cause made sense, we reasoned, because the existence of probable cause will be at issue in "practically all" retaliatory prosecution cases, has "high probative force," and thus "can be made mandatory with little or no added cost." Moreover, imposing that burden on plaintiffs was necessary to suspend the presumption of regularity underlying the prosecutor's charging decision—a presumption we "do not lightly discard." Thus, *Hartman* requires plaintiffs in retaliatory prosecution cases to show more than the subjective animus of an officer and a subsequent injury; plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause.

*Nieves*, 139 S. Ct. at 1722–23.

While showing an absence of probable cause is clearly required for some First-Amendment retaliation claims, the requirement does not apply in all cases. Meade does not allege retaliatory arrest or retaliatory prosecution as the basis for his claim. Instead, he challenges other actions by Smith that allegedly caused harm before any arrest or prosecution occurred. I am aware of no binding authority requiring a plaintiff to prove a lack of probable cause under these circumstances. And, in fact, the reasons outlined in *Hartman* and *Nieves* for adopting a no-probable-cause element are generally absent here. If Meade were challenging only Smith's decision to investigate Meade, or the search warrant itself, requiring Meade to show a lack of probable-cause would likely be

justified. *See Fredin v. Clysdale*, No. 18-CV-0510, 2018 WL 7020186, at *7 (D. Minn. Dec. 20, 2018) (drawing analogy to *Hartman* to find that First Amendment retaliation claim failed as a matter of law due to existence of probable cause for search warrant), *report and recommendation adopted*, No. 18-CV-0510, 2019 WL 802048 (D. Minn. Feb. 21, 2019). Probable cause for these actions would fulfill the same role as it does for arrests and prosecutions by providing "a 'distinct body of highly valuable circumstantial evidence' that is 'apt to prove or disprove' whether retaliatory animus actually caused the injury." *See Nieves*, 139 S. Ct. at 1723 (quoting *Hartman*, 547 U.S. at 261).

Here, however, Meade challenges the manner in which Smith carried out his investigatory activities, not the mere fact of the investigation. Viewing the record most favorably to Meade, it is obvious that Smith went above and beyond normal investigatory tactics. He conducted an investigation into Meade by exchanging information with private parties known to be hostile towards Meade, thus raising questions about the integrity and independence of the investigation. He drafted a 119–page, singled-spaced affidavit in support of a search warrant. That affidavit contained allegations of criminal conduct and confidential information unrelated to witness tampering, with avowed enemies of Ripoff Report and Meade serving as the source for many of those allegations.

Making matters worse, Smith filed the application as public record, rather than sealing it as is his usual practice. This deviation from practice allowed him to publicly air his allegations about Meade before filing any charges. Of even more concern is Smith's decision to do essentially the same thing in the course of filing a motion to quash a subpoena in a child custody case between Richter and Michael Roberts. This action had no relation to whether Smith had probable cause to file charges against Meade and could be viewed as nothing more than another mechanism through which Smith could make an official record of his allegations against Meade.

In short, when viewed most favorably to Meade, there are genuine issues of fact for trial on Meade's First Amendment retaliation claim. Meade is not required to demonstrate a lack of probable cause for the actions he challenges and there is sufficient

evidence to show that "the presumption of regularity accorded to prosecutorial decisionmaking" should be suspended and to raise a genuine issue about retaliatory motive. *See Hartman*, 547 U.S. at 263–65. Even if the eventual prosecution against Meade may have been supported by probable cause, that would not retroactively shield Smith from liability for prior wrongful acts. *See Buckley*, 509 U.S. at 276. Smith is not entitled to summary judgment on Meade's First Amendment retaliation claim.

## C.    *Malicious Prosecution*

The elements of malicious prosecution under Iowa law are:

> (1) a previous prosecution; (2) instigation of that prosecution by the defendant; (3) termination of that prosecution by acquittal or discharge of the plaintiff; (4) want of probable cause; (5) malice on the part of the defendant for bringing the prosecution; and (6) damage to the plaintiff. This damage to the plaintiff must be for an arrest of the person, seizure of property or special injury – injury that would not ordinarily result in all similar cases involving such a claim.

*Whalen v. Connelly*, 621 N.W.2d 681, 687–88 (Iowa 2000). Smith argues that he is entitled to summary judgment on Meade's malicious prosecution claim because prosecuting a case is entitled to absolute immunity and Meade has failed to show a lack of probable cause to bring charges against him. Doc. No. 34-2 at 24–30. He does not challenge any other element of Meade's claim. In his resistance, Meade does not address the issue of probable cause but argues that Smith is not entitled to summary judgment because he has failed to meet his burden of showing that he is entitled to absolute immunity. Doc. No. 40-1 at 11–12.

Under Iowa law, prosecutors are generally entitled to absolute immunity from claims of malicious prosecution for cases they prosecute. *Venckus*, 930 N.W.2d at 804. Absolute immunity applies to prosecutions "without regard to motive or intent. . . . 'even when the [official] is accused of acting maliciously and corruptly.'" *Id.* (alteration in original) (quoting *Blanton v. Barrick*, 258 N.W.2d 306, 308 (1977)); *see also Phelps v. Dawson*, 97 F.2d 339, 340 (8th Cir. 1938) (fire marshal, who had power bring charges

for arson under state statute, was not liable for damages in bringing charges even though he did "so without probable cause and with malice"). Thus, liability for a malicious prosecution claim is not based in the prosecution itself, even though that is the retaliatory act that ultimately causes harm to the plaintiff. *Nieves*, 139 S. Ct. at 1723 ("[I]n retaliatory prosecution cases the official with the malicious motive does not carry out the retaliatory action himself—the decision to bring charges is instead made by a prosecutor, who is generally immune from suit and whose decisions receive a presumption of regularity."). Liability is based in the act of maliciously inducing or instigating a prosecution *for which there is no probable cause*.

The no-probable-cause element is crucial to holding a defendant liable for malicious prosecution because it bridges the gap in causation between the plaintiff's harm (facing charges brought by a prosecutor who is protected by absolute immunity) and the defendant's wrongful act (maliciously attempting to induce the prosecution). *See id.* ("[E]ven when an officer's animus is clear, it does not necessarily show that the officer "induced the action of a prosecutor who would not have pressed charges otherwise." (quoting *Hartman*, 547 U.S. at 236)); *see also Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878) ("The existence of a want of probable cause is, as we have seen, essential to every suit for a malicious prosecution. Both that and malice must concur. Malice, it is admitted, may be inferred by the jury from want of probable cause, but the want of that cannot be inferred from any degree of even express malice."). In contrast, the existence of probable cause indicates that the prosecution may have occurred even without the defendant's malice and attempts to induce it. *See Hartman*, 547 U.S. at 261. Thus, the existence of probable cause effectively shields the defendant's earlier malice and acts of inducement from liability for malicious prosecution.

Clearly, any extent to which Meade seeks to hold Smith liable for the actual prosecution of his criminal case would be barred by absolute prosecutorial immunity. However, that does not necessarily dispose of Meade's claim. As discussed above, Meade alleges that Smith performed many acts before bringing any charges that, in effect,

could be deemed as attempts to "instigate" the prosecution. In other words, this case involves a unique situation in which the prosecutor who ultimately made the decision to bring criminal charges against Meade is also the defendant who is alleged to have wrongfully induced that prosecution.

While this situation may be unique, Meade's malicious prosecution claim must fail because he has failed to raise a genuine issue of fact regarding the no-probable-cause element of that claim. Smith has demonstrated, as a matter of law, that probable cause existed to support his prosecution of Meade. Smith is entitled to summary judgment on the malicious prosecution claim.

### D. Meade's Claims for Injunctive Relief and Economic Damages

Smith's remaining arguments relate to the relief Meade seeks in this case. First, Smith argues that he is entitled to summary judgment on Meade's request for a permanent injunction against further investigation and/or prosecution in relation to the facts of this case because there are adequate remedies at law. Doc. No. 34-2 at 31–32. Meade has not responded to this argument. As I agree with Smith's argument, and Meade has not resisted it, I will grant summary judgment in favor of Smith on this issue.

Second, Smith asks that the court grant summary judgment on Meade's claims for economic damages. *Id.* As previously noted, Meade has refused to answer questions under oath concerning his past wages and taxes. Judge Roberts issued an order (Doc. No. 31) giving Meade a period of time to answer Smith's questions or face sanctions. Smith requests that the sanction be dismissal of Meade's claims for economic damages by granting summary judgment. He has also presented a letter in which Meade's attorney provides "formal notice that Meade ha[s] agreed to forego any claims for past or future lost wages." Doc. No. 34-3 at 4. Meade does not address this issue in his resistance. Under these circumstances, Smith is entitled to summary judgment on Meade's claims for compensatory economic damages.

## VI.    CONCLUSION

For the foregoing reasons, defendant Ben Smith's motion (Doc. No. 34) for summary judgment is **granted in part** and **denied in part**, as follows:

1.     The motion is **granted** as to Meade's Fourth and Sixth Amendment claims in Count I, and as to Counts II, III and IV.  Those claims are **dismissed**.

2.     The motion is also **granted** as to Meade's claims for relief in the forms of (1) a permanent injunction against further investigation and prosecution and (2) compensatory economic damages.  Those requests for relief are **dismissed**.

3.     The motion is **denied** as to Meade's First Amendment retaliation claim in Count I.  That claim will procced to trial.


**IT IS SO ORDERED.**

**DATED** this 11th day of March, 2020.


_____
Leonard T. Strand, Chief Judge